UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ARTHUR MANESS, et al.,              )
                                    )
        Plaintiffs,                 )
                                    )
    vs.                             )        Case No.   4:04CV01157 ERW
                                    )
ST. FRANCOIS, COUNTY OF, et al.,    )
                                    )
        Defendants.                 )

## MEMORANDUM AND ORDER

This matter comes before the Court upon Defendants' Motion for Summary Judgment [doc. #32], Defendants' Motion to Strike Exhibits A and E [doc. # 44], Plaintiffs' Motion for Leave to File Exhibit A-1 [doc. # 49], Defendants' Motion for Relief from Mediation [doc. #52], and Defendants' Motion for a Daubert Hearing [doc. #54].

## I. BACKGROUND[1]

On September 6, 2001, Patricia Maness arrived for intake at the jail in St. Francois County ("Jail"). Upon her arrival, Maness completed the jail's intake process. She was asked a series of questions by Officer Josh Rennie.[2] Although Officer Rennie cannot recall the event itself, he claims that it is his invariable habit, practice, and routine to ask new inmates whether

---

[1]The following facts are taken from the summary judgment record and are either uncontroverted or viewed in the light most favorable to Plaintiff's case.

[2]At the time Officer Rennie completed Maness' intake process, Officer Rennie had only worked at the jail for six days and had not read any St. Francois County manual regarding intake procedures. However, Officer Rennie did know that if Maness or any inmate indicated she was considering suicide, then he should place the inmate in a specially designed and monitored cell.

they are considering suicide. Maness responded to this and other related questions in the negative. At no time did Officer Rennie perceive that Maness was suicidal.

Once an inmate has completed the intake process, she will not be questioned about suicidal thoughts again unless it is brought to jail personnel attention by a phone call from a family member, another inmate in the cell block, or by that particular inmate that something is wrong with an inmate.

At approximately 6:45 to 7:00 p.m. on September 11, 2001, Maness hung herself in her jail cell. During that time, Doylene Danieley,[3] a commissary dispenser, was distributing products recently ordered by the inmates from the commissary. Maness had ordered soda, ink pens, a pillow and popcorn either that morning or the previous day to be delivered on the evening of September 11, 2001, but did not answer when Danieley called her name to retrieve her items. Maness' door was partially closed, and she had a towel over the window in her door.[4] Meredith Manser, another inmate, discovered Maness hanging in her cell. She said that there was still some flesh tone in her face when she discovered her, but Maness was "turning like a blue color."

Kim McClane, an inmate, approached Danieley and whispered in her ear that Maness had hanged herself. When Danieley arrived at Maness' cell, Maness' face was "discolored." Danieley immediately radioed for assistance. Within about ten seconds, several deputies arrived in the cell block. Kristen Collins Tate was one of the responding officers. According to Officer Tate,

---

[3]The Court is unclear of the correct spelling of Doylene's surname. Plaintiffs spell her surname "Daniely," Defendants spell it "Donnelly" and it is spelled "Danieley" in her deposition. The Court will refer to her as Doylene Danieley.

[4]The Court notes that it was common for inmates put towels over the cell windows for privacy; however, this was a rule violation. The Jail's policy against allowing the towels was so that jail personnel could "keep an eye on them" and "prevent themselves from hurting themselves."

Maness "appeared. . .to be dead: her eyes were wide open and completely non-reactive in any way that I could notice, her mouth was open with her tongue sticking out in a swollen and fixed way, and I could smell that she had defecated on herself." Jason Rayoum also responded to the call. Officer Rayoum thought that Maness "appeared. . .to be dead, in that she had discolored skin and she did not appear to be breathing." Officer Rayoum radioed another officer to call for emergency medical help. When Officer Deanna Wright responded and saw Maness hanging in her cell, she "freaked out," and fainted. The other Officers took Wright to another room, while Danieley attempted to get all the inmates back in their cells.

Maness had hung herself with a bed sheet which she had slid behind a metal plate against the wall approximately four and one-half feet above the floor. The metal plate was not exactly flush with the wall, and it stuck out approximately five to eight millimeters[5] from the wall, causing a small gap. Inmate Cynthia Stevens, a nurse by training, offered to assist the Officers. However, like all the other inmates, she was instructed to return to her cell.

The Jail did not have a defibrillator. Instead, Officer Tate ran to her car, parked outside of the Jail, to retrieve a CPR mask.[6] After Officer Tate returned, she may have began CPR.[7] Officer Rayoum did not perform any lifesaving techniques while waiting for Officer Tate, or after she returned. During the time that Tate was performing the CPR, the bed sheet was still around Maness' neck; Officer Rayoum did not remove it because it was not loose enough to slip it off

[5]A millimeter is slightly less than one twenty-fifth of one inch.

[6]Officer Tate was not aware of any medical supplies in the building. Rodney Harris, the St. Francois County jail nurse, was not at the jail at the relevant time, and when he is not there, there is not a nurse on-site.

[7]Plaintiffs' description of the facts is inconsistent about whether CPR was performed prior to the arrival of the paramedics. Plaintiffs cite deposition testimony indicating that Tate began CPR after retrieving the mask, and Plaintiffs also cite testimony denying that jail officials performed CPR before the paramedics arrived.

3

and he had nothing to cut it. There is paramedics arrived approximately 10 minutes after Officer

Rayoum requested a call for emergency help.[8] Maness was taken to the hospital after she was

revived by paramedics. She was alive when she left the Jail, but was officially pronounced dead

from the hanging about forty hours later.

During her stay at the Jail, Maness never explicitly expressed any intention to commit

suicide. One inmate, Charla Lowe, reported after the suicide that Maness had been acting

"goofy" that day. Stevens, another inmate, believed that Maness talked to herself and was a

loner. According to inmate Manser, Maness "wasn't herself" and "everyone said 'she was

withdrawing off the drugs, the Oxycontin or whatever she was doing, so she was just withdrawn

but then she'd be real happy. Her moods was [sic] swinging different ways, you'd never know.'"

Manser also saw Maness crying after she talked on the telephone. Another inmate, Anjela

Cardwell, believed her strange demeanor was because Maness "was coming down off drugs."

Cardwell remembers Maness "skipping around the day room like she was the happiest person in

the world," then she "got bad news from her husband or boyfriend" by telephone and was "really

down then," but she was "skipping around the day room again before the incident that took her

---

[8]Plaintiffs allege that Maness was left to hang for 10 to 15 minutes before being cut down.
Plaintiffs cite to Manser's deposition testimony. The Court finds Plaintiffs' representation to be
inconsistent with Manser's full testimony attached to the briefing. Specifically, Manser testified
that she could not see Maness still hanging because all she could see was the head of the bed, and
Maness was hanging near the foot of the bed (Exh. K, p. 19, ¶¶ 14 - 20). Manser also specifically
stated that she did not know whether they started helping Maness after the ambulance arrived or
before then. (Exh. K, p. 20, ¶¶ 8 -14). She "couldn't tell if they [were] working on her when
they'd go in there" prior to the ambulance arriving. Also, she did not see the Officers cut her
down. (Exh. K, p. 22, ¶¶ 22). Moreover, Plaintiffs themselves cite to the deposition testimony of
Jason Rayoum, where he describes taking Maness down from where she was hanging and placing
her on the bed.
Anjela Cardwell testified that Maness was left to hang for 20 to 30 minutes before being
cut down when the paramedics arrived.

life." However, the Court notes that none of the inmates communicated to any of the jail personnel Maness' strange behavior or the possibility that she might kill herself.[9]

There is evidence that Patricia Maness spoke with her husband, Arthur Maness, on September 11, 2006 prior to her committing suicide. After speaking with her husband on the telephone, Maness complained to Cardwell that she was afraid she would never see her children again. The Jail utilizes a computerized system to record outgoing telephone calls made by the inmates. No one monitors or listens to those calls while the call is in progress. According to Lieutenant Gregory Armstrong, the Chief Deputy of the St. Francois County Sheriff's Department, while the staff members of the Jail had methods to listen to recorded telephone calls, the only circumstances in which someone retrieves or listens to it would be in the event of either an inmate escape, or if it is requested as relating to a criminal prosecution or civil litigation. The recorded conversations are saved on the computer for approximately six months, and are capable of being retrieved during that six-month period. After that time, the computer recycles the tapes by recording over the previous telephone calls. Because this lawsuit was not filed for nearly three years after the death of Patricia Maness, the tape recorded telephone calls she made on September 11, 2006, were recycled and new calls have been recorded on the tapes.

Since October 1996, there have been three suicides by hanging at the Jail. During his deposition, when Corporal James Honey was asked if he had ever heard of any other suicides or suicide attempts at the Jail, he answered "Officially, no." When asked about "unofficially," he responded "You're not supposed to ask. I heard there was one at the old jail, but I, I don't know."

---

[9]Some of the inmates did communicate Maness' strange behavior to jail personnel *after* she hanged herself.

On August 27, 2004, Arthur Maness, D.M, and A.M. filed suit against St. Francois County and Daniel Bullock. At the time of the hanging, Arthur Maness was Patricia Maness' husband. D.M. and A.M. are the biological children of Maness. Defendant Daniel Bullock is being sued in his official capacity as the Sheriff of St. Francois County and in his individual capacity. Count I of Plaintiffs' Amended Complaint ("Complaint") alleges that Defendants violated 42 U.S.C. § 1983, due to a practice, policy, procedure, and custom of failing to train properly and failing to supervise its Sheriff, deputy sheriffs and jailers. Plaintiffs further allege that Defendants exhibited a lack of due care in executing the duties of a County government, Sheriff, deputy sheriff and jailer. Plaintiffs allege in Count II that Defendants are liable for the wrongful death of Maness because the metal plate on the wall in Maness' cell was a dangerous condition resulting in her death.

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Crumley v. City of St. Paul*, 324 F.3d 1003, 1006 (8th Cir. 2003). The United States Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 1).

"'By its terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Hufsmith v. Weaver*, 817

F.2d 455, 460 n.7 (8th Cir. 1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis added by Supreme Court)).  Material facts are "those 'that might affect the outcome of the suit under governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 247-48).  Summary judgment will be denied due to a material issue of genuine fact if "the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." *Crumley*, 324 F.3d at 1006.  Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23, *quoted in*, *St. Jude Med., Inc. v. Lifecare Intern., Inc.*, 250 F.3d 587, 595 (8th Cir. 2001).

In analyzing summary judgment motions, the court must view the evidence in the light most favorable to the non-moving party.  *Crumley*, 324 F.3d at 1008.  The non-moving party is given the benefit of any inferences that can logically be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000).  The court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id*.

### III. DISCUSSION

### A.  Count I: The 1983 Claim

Plaintiff brings his suit pursuant to 42 U.S.C. § 1983.  This Section states that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State. . . subjects, or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

Plaintiffs allege violations of the Eighth, Fourth, Fifth, and Fourteenth Amendments. Courts treat allegations relating to a failure to prevent an inmate suicides as a failure to provide adequate medical treatment. *Drake v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006); *Lambert v. City of Dumas*, 187 F.3d 931, 936 (8th Cir. 1999) ("The right to have medical needs addressed includes the right to be protected from a known risk of suicide."). Typically, it is a violation of the Eighth Amendment to deny medical care for serious medical needs when the denial results in pain and suffering that serves no penological purpose. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). However, in this case, Maness was a pretrial detainee, and therefore Plaintiffs' claim is analyzed under the Due Process clause of the Fourteenth Amendment. *Vaughn v. Greene County*, 438 F.3d 845, 850 (8th Cir. 2006); *Davis v. Hall*, 992 F.2d 151, 152 (8th Cir. 1993) (citation omitted). This distinction is inconsequential, however, because the Fourteenth Amendment analysis is the same as under the Eighth Amendment. *Vaughn*, 438 F.3d at 850 (analyzing claim under deliberate indifference standard).

In order to find a violation, the inmate has the burden of proving both a subjective and objective component. *Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir. 1993). First, the prison official must deprive the inmate of a right that is objectively "sufficiently serious" to rise to the level of a constitutional violation. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The "act or omission must result in the denial of the minimal civilized measure of life's necessities." *Id.* (internal quotations omitted). Second, the "prison official must have a sufficiently culpable state of mind." *Id.* (internal quotations omitted). "[T]hat [subjective] state of mind is one of

'deliberate indifference' to inmate health or safety." *Id.* Deliberate indifference exists when the prison official "knew of, yet disregarded, an excessive risk to his health." *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) (quoting *Logan v. Clarke*, 119 F.3d 647, 649 (8th Cir. 1997); *Vaughn*, 438 F.3d at 850 (noting that "[t]o establish a constitutional violation, it is not enough that a reasonable official should have known of the risk"). Therefore, for Plaintiff to succeed in his claim that Defendants were deliberately indifferent, he "must evidence (1) he suffered from a serious medical condition, (2) defendants knew of the condition, and (3) defendants deliberately disregarded the condition." *Kitchen v. Miller*, 343 F.Supp.2d 820, 823 (E.D. Mo. 2004); *see also Drake*, 445 F.3d at 1042 (plaintiff must "show that the official actually knew that the inmate faced a substantial risk of serious harm and failed to respond reasonably to abate that risk").

A serious medical need exists when a person "has been diagnosed by a physician as requiring treatment or [the need] is so obvious that even a lay person would easily recognize the need for a doctor's attention." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). Deliberate "indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05; *Drake*, 445 F.3d at 1042 (deliberate indifference requires more than negligence).

Plaintiffs have sued the County of St. Francois and Daniel Bullock, the Sheriff of St. Francois County, as supervisors of the individual jailers. Supervisors are not liable under a theory of respondeat superior in § 1983 claims. *Vaughn*, 438 F.3d at 851. Instead, according to *Monell v. Department of Social Services*, plaintiffs must establish that the "government's policy or custom. . .inflicts the injury that the government as an entity is responsible [for] under § 1983." 436 U.S. 658, 694 (1978). Under *Monell*, local government and its officials may not be sued

under § 1983 for an injury inflicted solely by its employees or agents. It is only when a government's execution of a policy or custom made by lawmakers, or by those whose edicts or acts may fairly be said to "represent official policy," inflicts injury for which the government as an entity is responsible under § 1983. *Id.* at 695. The parties agree that there are no written policies for the jailers and other personnel managing prisoners at the Jail. Under *Monell,* to establish Defendants' official liability, plaintiffs must show that the "government policy or custom. . .inflicts the injury that the government as an entity is responsible for under § 1983." *Id; see also Vaughn*, 438 F.3d at 851 (holding that plaintiff failed to demonstrate that defendant "was deliberately indifferent to or tacitly authorized the offending acts"). "A municipality may be liable for failure to train its employees when that failure can be shown to be deliberate indifference to the rights of others." *Yellow Horse v. Pennington County*, 225 F.3d 923, 928 (8th Cir. 2000); *Vaughn*, 438 F.3d at 851 ("A supervisor may be held individually liable. . .if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights.").

   1. *Lack of Notice of Particularized Suicide Risk*

   Defendants argue that there was no underlying constitutional violation in this case because the jailers had no notice that Maness posed a particularized risk of suicide. "It is not enough to show the risk was obvious. A prison official is not liable under the Fourteenth Amendment unless the official knows of facts evidencing a substantial suicide risk *and* the official actually infers the prisoner presents a substantial suicide risk." *Coleman v. Parkman*, 349 F.3d 534, 538 (8th Cir. 2003). "[O]fficials do not violate the Constitution when they negligently fail to diagnose a prisoner's suicide risk." *Id.* at 540.

   Plaintiffs claim that the jailers had notice of Maness' intention to kill herself because:

   a. Patricia Maness attempted suicide in May 2001;
   b. Plaintiff had track marks on her arm, and rotten teeth;

c. Fellow detainees described Patricia Maness' demeanor as "very strange," "goofy," not herself and her "moods was [sic] swinging different ways;"

d. One detainee saw Maness skipping around the day room like she was the happiest person in the world, then down, then skipping around right before her hanging;

e. The Jail recorded telephone calls, and the jailers had the ability to monitor the calls, and some of Patricia Maness' "low" moods were brought on by conversations on the phone;

f. Patricia Maness complained to a fellow detainee that she was afraid she would never see her children again;

g. A fellow detainee saw Maness start crying after she got off of the phone with her boyfriend David Dunn a couple of hours before she hanged herself;

h. One detainee heard from other detainees that Patricia Maness was facing some time in prison, going through a divorce and found out her boyfriend was seeing someone else;

i. In Nurse Harris' training on suicide intervention, he learned that a person who is contemplating suicide is "withdrawn, and very quiet and reserved…." "Often, it's not a person that says they're going to commit suicide are usually the last ones, it's usually the ones that don't say, do it, seems to be the pattern that's followed."

The Court finds that Plaintiffs have failed to present any evidence showing that any jail employee was ever told, or ever knew, that Maness posed a particular risk of suicide during her stay. The Court will address each of Plaintiffs' arguments seriatim. (a.) There is no evidence that officials at the jail knew of Maness' prior suicide attempt, nor do Plaintiffs claim that medical records were provided to the Jail. (b.) Plaintiffs' claim that the jailers knew of Maness' drug habit does not provide evidence of notice. Plaintiffs' expert admits that 85% of female inmates suffer from drug abuse or dependency and diagnosable depression or similar mental health disorder, and an assessment of drug abuse or dependence would not necessarily reveal a risk of suicide. Plaintiffs do not point to anything specific to Maness' drug problem that would suggest a particularized risk of suicide. (c., d.) While Maness' fellow detainees claim that Maness' behavior was abnormal, there is no evidence that they communicated this information to anyone at the Jail. Furthermore, Plaintiffs have not presented any evidence that any of the jailers saw Maness behaving abnormally. (e.) Plaintiffs claim that the officials at the jail had the ability to record and monitor telephone

calls.  Plaintiffs refer the Court to the testimony of Lieutenant Gregory Armstrong.  In

Armstrong's deposition, he states that all outgoing phone calls are recorded and archived for six

months.  In his deposition, he does not address whether the conversations are monitored.  As

evidence in support of the claim that the telephone calls are monitored, Plaintiffs cite Meredith

Manser's deposition.  First Manser stated that, to her knowledge, the employees of the Jail had

access to hear phone calls.  However, she did not know whether the employees listened to each of

the phone calls as they occurred.  The affidavit of Armstrong addressed this issue.  He stated that:

> During September 2001, and at all times since then, the St. Francois County,
> Missouri Sheriff's Department utilized a computerized system to record
> outgoing calls made by the inmates on the telephones available in each cell
> block.  No one listens to or monitors those calls while the itself is being made
> and/or while it is in progress.. . .The recordings from those calls are saved on
> the computer for approximately six months, and are capable of being retrieved
> during that time frame.  After that time frame, the computer system recycles the
> tapes by re-recording over the archived data from the previous calls.. . .After
> the cal has been completed and recorded on the computer system, the only
> circumstances in which someone from the St. Francois County, Missouri
> Sheriff's Department retrieves or listens to it would be in the event of either an
> inmate escape, or if it would be requested with respect to a criminal prosecution
> or civil litigation.  Such a request would have to be made within approximately
> six months after the particular call was made in order for anyone at the St.
> Francois County, Missouri Sheriff's Department to be able to retrieve the
> recording from the computerized system.

Thus, Plaintiffs have presented no evidence that the jail employees typically monitored phone calls

or monitored Maness' phone calls on September 11, 2001.  Moreover, Plaintiffs have presented

no evidence that, even if the phone calls were monitored, the content of the conversations would

have given the jailers specific notice that Maness was suicidal.  (f.) There is no evidence that the

detainees communicated Maness' concern about her children to any of the Jail employees.

Furthermore, Plaintiffs have not presented any evidence that Maness told any of the jailers about

her concern of never seeing her children again.  (g., h.) There is no evidence that the detainees

communicated this information to anyone at the Jail.  Furthermore, Plaintiffs have not presented

any evidence that any of the jailers saw Maness crying after speaking on the telephone nor evidence that the jailers talked with Maness about the problems in her personal relationships. (i.) Nurse Harris' discussion of signs of a suicidal inmate does not provide evidence that the jailers had notice of Maness' suicidal tendencies. While Harris testified that suicidal inmates typically act "withdrawn, and very quiet and reserved," Plaintiffs have presented evidence that other detainees saw Maness "skipping" around her cell prior to her suicide. Moreover, the fact that Maness ordered several items from the jail's commissary to be delivered on the evening of September 11, 2001, is inconsistent with Plaintiffs' claim that Maness appeared to be suicidal. Plaintiffs have provided no evidence that the Jail employees saw Maness' acting suicidal or any of the other detainees told the employees that Maness was acting suicidal.

In *Hott v. Hennepin*, a factually similar case, the Eighth Circuit found that jail officials had no notice that a pre-trial detainee was suicidal. 260 F.3d 901, 906 (8th Cir. 2001). The plaintiff claimed that jail officials had notice of the Hott's suicidal tendencies. While Hott had denied having suicidal ideation during the intake process, Hott had attempted suicide and the attempt was documented in the records of a hospital located in the same county as the county in which the jail was located. Also, Hott had discussed suicide with other inmates and occasionally made "strangling gestures," with sufficient force to leave red marks on his neck. The detainee made these gestures in his cell and also in the presence of jail guards. Finally, the plaintiff claimed that jail officials had notice because Hott appeared "glum" after a late night telephone call to his girlfriend. The court found that the prison had no duty to seek personal medical records from outside the prison, there was no evidence that the strangling gestures were interpreted as a suicide threat by jail officials, and it takes more than the appearance of being "glum" to "trigger a duty to inquire whether he is feeling suicidal." *Id*. at 906. The court ultimately held that "there is no

evidence to indicate that the [jail] or its employees had actual knowledge that [the detainee] posed a serious risk of harm to himself." *Id.*

The facts in *Hott* are similar to the facts in this case. Plaintiffs do not dispute the jailer's deposition testimony that he always asked prisoners at the intake stage whether they had suicidal thoughts, and the record is silent as to any statement by Maness that she had any prior thoughts of suicide. There is no evidence that the Jail possessed any records relating to Maness' prior suicide attempt, and the Jail had no duty to obtain such records. In *Hott*, the detainee talked about suicide with other inmates, but because there was no communication of this suicidal ideation to the jail officials, there was no notice. Here, Maness talked about her relationship problems and her concern that she would not see her children again, but Plaintiffs have presented no evidence that the jail officials knew any of this information. Finally, like in *Hott*, this Court finds that it is insufficient that Maness may have appeared "glum" or "depressed" to put Jail employees on notice that Maness was suicidal. For all of these reasons, this Court finds that there is no evidence that jailers *actually knew* that Maness was suicidal. Because there was no underlying constitutional violation, there can be no supervisor liability under § 1983. Since the Court finds that there was no underlying constitutional violation in the jailers failing to prevent the suicide of Maness, it is not necessary to address the practice, policy, procedure, and custom of Defendants relating to the jailers failure to determine that Maness was suicidal.

 2. *Evidence that Alleged Delay Contributed to Maness' Death*[10]

---

[10]As a preliminary matter, the Court notes that Plaintiffs failed to properly plead their claims relating to the alleged delay in Maness' medical care. *See* Fed. R. Civ. Pro. 8 (pleading should set forth "a short and plain statement of the claim showing that the pleader is entitled to relief"). However, because all parties have fully addressed this issue in the briefing, the Court will assume the claim was properly pled and consider the merits the argument.

A defendant's actions may constitute a Fourteenth Amendment violation of failing to provide medical care if the defendant's actions result in an intentional denial or delay in access to medical care. *Reed v. Woodruff County*, 7 F.3d 808, 810 (8th Cir. 1993). In *Reed*, jailer Charlene Smith checked on Reed after another inmate informed her that he had not seen Reed for awhile. Smith called out to Reed in his cell, but he did not answer. Smith asked a male police officer, Bobby Bogarth, to check the cell. *Id*. at 809. Bogarth found Reed hanging in his cell. After Bogarth determined that Reed was dead, he decided to leave Reed hanging so that the scene remained intact pending an investigation. *Id*. at 811. Plaintiffs brought suit, arguing that Bogarth should have attempted artificial resuscitation on Reed, and that such an attempt might have saved his life. The Court dismissed the plaintiffs claim because

> they have provided no evidence that Reed might be alive today if the custodians had handled the situation differently, nor have they provided any additional evidence or pointed to any facts already in the record which put Bogarth's credibility in issue. Thus, even if we were to assume that Bogarth should have tried to revive Reed, there is no evidence that the attempt would or could have succeeded.

*Id*. The facts in Reed are in many respects distinguishable from the facts here. Bogarth was an Emergency Medical Technician who, "evaluated Reed's physical condition and determined that he was dead." *Id*. at 809. Bogarth signed an affidavit confirming his findings. To avoid summary judgment, plaintiffs were obligated to provide "some positive showing that a genuine issue of material fact concerning Bogarth's actions remain for trial." *Id*. at 811. Plaintiffs failed to show that conduct of Bogarth was actionable because they were unable to come forth with contradicting evidence advanced by Bogarth.

In this case, it is undisputed that Patricia Maness survived the suicide attempt. She lived for forty hours after being taken to the hospital by paramedics. The Court cannot at this stage of the case make credibility findings. Plaintiffs' own evidence in contradictory in many respects.

Plaintiffs take conflicting positions as to whether Officer Tate administered cardio-pulmonary resuscitation before the paramedics arrived in an attempt to revive Maness, and if she did, when did she do so. Plaintiffs' evidence also conflicts as to the length of time Maness was allowed to remain hanging before she was "cut-down." Indeed, Plaintiffs present evidence of times varying from five minutes to thirty minutes. This Court is not permitted to say at this stage of the case which witnesses are to be believed, because a jury might embrace the testimony of Angela G. Cardwell who was present when Maness was suspended by her neck. Plaintiffs are entitled to the most favorable interpretation of the facts. Before Maness was taken down, Deanna Wright came into the cell and promptly fainted at the sight of the dangling body. The following questions were asked of Ms. Cardwell during her deposition and she made the following responses.

Q. You said that some of the deputy sheriffs were attending to Deanna Wright when she fell out or fainted or passed out, correct?

A. Yes. And we were really upset.

Q. You were what.?

A. We were really upset that they were tending to her and left the girl hanging.

Q. They left Patricia Maness while they were attending to Deanna Wright?

A. Yes.

Q. And how long did that happen? How long were they attending to Deanna Wright while they left Patricia Maness hanging?

A. I don't know how long it was. I do know that it seemed like it took every bit, from the time we found her, almost thirty minutes for an ambulance to get there and she was still on he wall when they got there.

Q. Patricia Maness was still hanging when the EMT's arrived?

A. Yes.

Q. And you saw this?

A. Yes.

Q. You could see in Patricia Maness's cell?

A. Yes. I seen them taking her down off the wall.

Q. Who took Patricia Maness down off the wall?

A. It's looked to me like it was the EMT's. Now, if it was someone that worked for the jail and I assumed they were EMT's, then I'm wrong; but it looked to me, from what I saw, that it was the EMTs that took her down off the wall.

***

Q. And during he entire time that Deanna Wright was being attended to by the deputy sheriffs was Patricia Maness still hanging on the wall?

A. Yes, sir.

Q. Are you positive about that?

A. I'm positive. Yeah. I was very upset about that. I was upset that we didn't go take her down.

In Reed, there was no evidence to refute Bogarth's conclusion that Reed was dead when he was first discovered. Here, it is undisputed that Maness survived for forty hours after she was taken to the hospital. This Court finds that if Ms. Cardwell is believed, a jury could infer that the defendants' actions resulted in an intentional denial or delay in providing Maness medical care so that her chances of survival were diminished. *See Bradich v. City of Chicago*, 413 F.3d 688, 691 (7th Cir. 2005) (although times proposed by plaintiff as to how long it took for the jailers to call for medical personnel following a hanging may have been inaccurate, plaintiff receives all reasonable inferences at the summary judgment stage).

While Defendants are not liable under the doctrine of *respondeat superior*, the Court will consider whether either may be liable because of the alleged delay in addressing Maness' medical needs after she was discovered hanging in her jail cell. The Court will address whether the Jailers

17

performed pursuant to a "government policy or custom" and whether Sheriff Bullock is liable for " a practice, policy, procedure, and custom of failing to train properly and failing to supervise properly ... jailers," as alleged in the First Amended Complaint.  A supervisor may be held individually liable under § 1983 if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights.  Plaintiffs must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts, which requires a showing that the training procedures and supervision were inadequate and likely to result in a constitutional violation.  *See Wever v. Lincoln County Nebraska,* 388 F.3d 601, 606 (8th Cir. 2004).

In *Wever*, a man was arrested after he made a 911 call.  Officers were concerned that he was suicidal because he was depressed and crying during the call.  Prior to his arrest, the man threatened to kill himself if jailed.  Not long after he was arrested and placed in a cell, he requested a blanket.  After receiving the blanket from the jailers, he hung himself.  The district court was affirmed for denying summary judgment to the Sheriff on plaintiff's claim for individual liability against the Sheriff, "in large part because he 'did not present any evidence showing what training procedures, if any, were in place for handling potentially suicidal detainees or inmates, nor did he present any evidence showing what steps, if any were taken following' an earlier suicide that had occurred during his term as sheriff."  *Id.* at 605.  The Sheriff was aware of two prior suicides in the Lincoln County jail, one in 1999 while he was sheriff and one in 1966 before his term began.  The Eighth Circuit recognized that a supervisor may be individually liable under § 1983 if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights.  *See also Vaughn,* 438 F.3d at 851 (failure to properly supervise and train the offending employee may cause a deprivation of a constitutional right).

The Court recognized plaintiff's burden of demonstrating that the supervisor was deliberately indifferent to or tacitly authorized the offending acts. "This requires a showing that the training procedures and supervision were inadequate and likely to result in a constitutional violation." The Court noted that although the Sheriff did not contest supervisory liability in his motion for summary judgment, he did address it in his reply brief. In a qualified immunity analysis, the Court ruled, "[i]n some instances, one or two suicides may be sufficient to put a sheriff on notice that his suicide prevention training needs revision. . .Wever has alleged that Carmen [sheriff] was placed on notice by two previous suicides, and we cannot say this is insufficient as a matter of law." *Id* at 608.

In the present case, Lt. Gregory Armstrong testified in his deposition that since October 1996 when the Jail was constructed, there have been two suicides by hanging in this jail, other than Maness, along with an additional three attempted suicides since October 2004. Corporal James Honey was asked if he knew about other suicides and replied, "[o]fficially no, and, "[y]ou're not supposed to ask. I heard there was one at the old jail, but I, I don't know." If he is correct that there was one in the old jail, that would be three suicides in addition to the Maness suicide in ten years in St. Francois County jails.

As in *Wever,* there was evidence of knowledge, at least by jailers, that the person who died in jail by suicide, or who attempted suicide, had notified jailers or police arresting the person, that they were suicidal, or there was evidence to put jailers on notice that the person required special observation or attention because of the potential for harm to the individual. As already noted, while a supervisor may be held individually liable under § 1983 for failure to properly supervise and train employees, plaintiff must demonstrate that the supervisor was deliberately indifferent to, or tacitly authorized, the offending acts. This requires a showing that the

supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation. That failure must be shown to be deliberate and indifferent to the rights of others.

Here, for there to be a deprivation of any constitutional right for failure to provide medical care from delay in access to medical care, Plaintiffs must offer evidence that failure to properly supervise and train the jailers caused deprivation of a constitutional right. Plaintiffs have a burden to show that Sheriff Bullock had notice that any training procedures and supervision were inadequate. There is evidence in the record that for at least several minutes after learning that Maness was suspended by her neck in the Jail cell, jailers behaved as if there was no methodology, order or adherence to any procedure, policy or practice they were following in extricating Maness and administering medical care to her. For example, there is evidence that one of the jailers fainted, and other jailers attended to the passed-out jailer for several minutes instead of Maness. Actions of the jailers suggest a failure of proper supervision and training and a consequent deprivation on a constitutional right by delay in receipt of medical care to Maness.

To meet their burden to survive summary judgment on this point, Plaintiffs must demonstrate that Sheriff Bullock had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation. In his brief, Sheriff Bullock claims that training procedures were adequate. Defendants argue that although no *written* policy was in place at the time, the Jail did have *unwritten* written policies. The Court has found no evidence in the record relating to specific policies, written or unwritten, instructing the jailers on measures to take in the event of an inmate suicide.[11] There in nothing in the record concerning extrication of

---

[11]Defendants cite to the deposition of Corporal Honey in which he suggested that it would have violated the Jail's policy to leave Maness hanging. Other than this general statement that leaving her hanging would violate policy, Defendants provide no evidence on the contents of such

persons hanging in the Jail or procedures to provide for their medical attention. There is no rebuttal in response to Plaintiffs claims, that no training had ever been conducted or supervision provided in situations concerning suicide by hanging of persons in Sheriff Bullock's custody in the St. Francois County Jail, notwithstanding at least two and perhaps three suicides before the Maness hanging. The Court finds that based on all of the evidence in the case, Sheriff Bullock had notice that the training procedures and supervision of jailers were lawfully inadequate and likely to result in a constitutional violation. Therefore, any allegation of delay will not be dismissed at this time. Because Plaintiffs' First Amended Complaint fails to properly allege a delay in medical care, the Court will grant Plaintiffs leave to file an amended complaint making such allegations.

### B. Count II: The Wrongful Death Claim

Sovereign immunity from tort liability exists in Missouri except when such immunity is specifically waived. One such exception exists for

> [i]njuries caused by the condition of a public entity's property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury directly resulted from the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury which was incurred, and that either a negligent or wrongful act or omission of an employee of the public entity within the course of his employment created the dangerous condition or a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

Mo. Rev. Stat. § 537.600. Plaintiffs claim that sovereign immunity has been waived in this case because the metal plate on the wall in Maness' cell constituted a dangerous condition. This Court holds that dangerous condition exception does not apply in this case, and thus, Defendants are entitled to sovereign immunity.

---

a policy, and whether the jailers knew about the unwritten policy referenced by Corporal Honey.

Plaintiffs have presented no evidence contradicting Defendants' evidence that the metal plate was not flush with the wall because of inmate tampering. Since there is no evidence that the gap between the wall and metal plate was caused by an act or omission of a jail employee creating the "dangerous condition," the Court will consider whether any of the Jail employees had actual or constructive notice of the metal plate not being flush with the wall. Plaintiffs have presented no evidence suggesting that anyone at the jail knew or should have known that the metal plate was not flush against the wall. Thus, the dangerous condition exception to the sovereign immunity doctrine does not apply in this case, and Count II will be dismissed.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [doc. #32] is **GRANTED in part, and DENIED in part**. Count I, as it relates to preventing the suicide of Maness is **DISMISSED** because there was a lack of notice to Defendants. Count II is **DISMISSED**. Count I, as it relates to the issue of delay in medical care will not be dismissed; however, due to the insufficiency of the allegations relating to the delay in medical care, Plaintiff is granted leave to file an amended complaint. Such complaint shall be filed no later than **June 24, 2006**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Exhibits A and E [doc. # 44] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave to File Exhibit A-1 [doc. # 49] is **GRANTED in Part.** The Court will not consider inadmissible facts relied upon by an expert as evidence to the existence of those facts. The Court will permit evidence of Mr. Haefeli's opinions.

**IT IS FURTHER ORDERED** that Defendants' Motion for Relief from Mediation [doc. #52] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for a Daubert Hearing is **GRANTED**. The Daubert Hearing will take place directly following the Pretrial Conference scheduled for June 30, 2006.

An appropriate Order of Dismissal will accompany this Order.

Dated this <u>19th</u> day of June, 2006.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE